T.C. Memo. 2010-9


UNITED STATES TAX COURT


JULIE LEIGH DOMENY, Petitioner $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 6975-08.[1]                    Filed January 13, 2010.


$\underline{\text{Brett L. Gibbs}}$ and $\underline{\text{Barbara N. Morrison}}$, for petitioner.

$\underline{\text{Matthew A. Williams}}$, for respondent.


MEMORANDUM OPINION


GERBER, $\underline{\text{Judge}}$:  Respondent determined a $9,543 deficiency in

petitioner's Federal income tax for 2005 and a $1,909 accuracy-

---

[1]This case was originally docketed as "small tax case" in accord with petitioner's designation.  At trial petitioner moved without objection from respondent that this case be removed from the small tax case category.  The Court granted petitioner's motion, and the docket number has been changed accordingly.

related penalty under section 6662(a). The parties have resolved all issues other than whether $16,933 petitioner received from her employer was excludable from gross income under section 104(a)(2).[2]

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2005, the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

Petitioner resided in California at the time her petition was filed. After completing high school petitioner obtained a degree in visual merchandising, cost, and design. She worked in theater and visual merchandising for approximately 20 years in the San Francisco area. Following those positions, petitioner became involved in professional fundraising for nonprofit organizations. After approximately 2½ years as a professional fundraiser petitioner was employed by the Pacific Autism Center for Education (PACE) in 2000.

During 1996 before her employment with PACE petitioner was diagnosed with multiple sclerosis (MS). At the onset of her MS

---

[2]Petitioner conceded that she failed to report a $799 State income tax refund and $59 of interest income. Petitioner also conceded that she failed to report $7,050 of wage compensation for 2005. Respondent conceded that petitioner acted in good faith and with reasonable cause and that she is not liable for any penalty under sec. 6662(a).

she experienced numbness from the waist down. The numbness receded to her feet, leaving them numb. She also experienced fatigue, lightheadedness, vertigo, and sometimes a burning sensation behind her eyes. Petitioner found the prescribed treatment (which did not ameliorate the symptoms of her condition) more profoundly troublesome than her symptoms, so she chose to "manage" her symptoms without medication. She left her position as a professional fundraiser before being hired by PACE, because she was seeking a job situation were she would not have to spend as much time on her feet.

Petitioner's duties with PACE included community development, fund raising, and writing grants. Petitioner enjoyed her work with PACE, and she was motivated by the children and parents who were involved with PACE's autism program. The fact that petitioner was ill with MS motivated her involvement with the cause of autism and the underlying fundraising activities.

After a while PACE appointed a new executive director who was to be petitioner's supervisor. The new executive director did not want petitioner to socialize or be involved with parents of autistic children, although she was required to somehow approach them for fundraising purposes. Petitioner had a strained relationship with her supervisor, who restricted her duties. By 2004 these concerns and conditions in petitioner's

workplace caused her MS symptoms to flare up.  In November 2004 it came to petitioner's attention that the director was embezzling funds from PACE's students' personal accounts. Petitioner went to PACE's board members with this information, and she was told that they would take care of the situation. Petitioner felt tension concerning her supervisor's alleged embezzlement.  In particular she was upset that PACE sent her out to raise funds from parents, knowing that funds were being embezzled by her supervisor.  Petitioner advised her superiors on several occasions of her unhealthful work environment, including her stress from the embezzlement and PACE's failure to take any action.  The series of events involving the embezzlement and resulting severance of the residential director caused petitioner much distress, and during that time her MS symptoms intensified.

Petitioner's symptoms continued to worsen, and on March 7, 2005, she left work.  On the next day she visited her primary care physician, Dr. Chris E. Chung.  At that time Dr. Chung determined that petitioner was too ill, because of her MS symptoms, to return to work and that she should not return to work until after March 21, 2005.  Petitioner's March 7, 2005, symptoms from MS included:  Vertigo, shooting pain in both legs, difficulty walking due to numbness in both feet, a burning sensation behind her eyes, and extreme fatigue.  On or about March 8, 2005, petitioner notified PACE by facsimile of Dr.

Chung's diagnosis and of the doctor's instructions that she not return to work until after March 21, 2005. After sending the facsimile on March 8, 2005, petitioner received a telephone call from PACE's executive director, who notified her that her employment would be terminated effective March 15, 2005. After that telephone conversation petitioner's physical MS symptoms were "spiking", including shooting pain up her legs, fatigue, burning eyes, spinning head, vertigo, and lightheadedness. During the taxable year 2005 petitioner was employed by PACE from January 1 through March 15.

Because of these circumstances, petitioner contacted a lawyer to seek redress from PACE. She explained the circumstances of her employment, illness, and dismissal to the lawyer, who agreed that she had a cause of action, and petitioner retained the lawyer to pursue PACE. Petitioner's lawyer negotiated with PACE lawyers, and a settlement was reached. The settlement agreement was entitled "Severance Agreement and Release of Claims" (the agreement). In the agreement petitioner released the following list of numerous possible causes of action or rights:

> (a) any and all rights and claims relating to or in any manner arising from the * * * [petitioner's] employment or the termination of her employment;

> (b) any and all rights and claims arising under the California Fair Employment and Housing Act * * *;

(c) any and all claims arising under the Civil Rights Act of 1964 * * *;

(d) any and all rights and claims arising under the Americans with Disabilities Act;

(e) any and all rights and claims arising [sic] the Age Discrimination in Employment Act of 1967 * * *;

(f) any and all rights and claims arising under the Family and Medical Leave Act or the California Family Rights Act;

(g) any and all claims for violation of the Fair Labor Standards Act, the California Labor Code, or the California Wage Orders; and

(h) any and all claims for breach of contract, breach of the covenant of good faith and fair dealing, invasion of privacy, infliction of emotional distress, defamation and misrepresentation.

Under the agreement $33,308 was the total amount PACE agreed to pay. Of the $33,308, $8,187.50 was compensation due to petitioner, which PACE agreed to send directly to petitioner's attorney. Petitioner reported the $8,187.50 on her 2005 Federal income tax return as wage compensation. Another $8,187.50 was sent directly to petitioner's attorney, and petitioner was not issued a Form 1099-MISC, Miscellaneous Income, or Form W-2, Wage and Tax Statement, by PACE for that amount. PACE paid the remaining $16,933 to petitioner without withholding deductions and issued a Form 1099-MISC reflecting that the amount was "Nonemployee compensation".

Petitioner did not attend the negotiations between her lawyer and PACE's lawyer. At the time petitioner received her

$16,933 settlement it was her understanding that it was to compensate her for physical injuries that occurred in a hostile work environment which PACE allowed to exist over an extended time.  Petitioner's intense MS symptoms, which occurred during her PACE employment, prevented her from working until sometime in 2006.

## Discussion

The sole question to be considered is whether the $16,933 settlement amount petitioner received is excludable from her gross income under section 104(a)(2).  More specifically, the parties disagree about whether petitioner received the settlement for her physical condition.  Section 104(a) provides in pertinent part:

> SEC. 104(a). * * * gross income does not include--
>
>    * * * * * * *
>
>> (2) the amount of any damages (other than punitive damages) received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal physical injuries or physical sickness;
>
>    * * * * * * *
>
> * * * For purposes of paragraph (2), emotional distress shall not be treated as physical injury or physical sickness.  The preceding sentence shall not apply to an amount of damages not in excess of the amount paid for medical care (described in subparagraph (A) or (B) of section 213(d)(1)) attributable to emotional distress.

To prevail, petitioner must show[3] that her claim against PACE was based on tort or tort type rights and that the damages were received on account of physical[4] injuries or sickness. Commissioner v. Schleier, 515 U.S. 323, 337 (1995); see also Commissioner v. Banks, 543 U.S. 426 (2005). The agreement, pursuant to which the $16,933 was paid, contains a list of numerous possible causes of action or rights that petitioner was releasing in exchange for the payment. In all respects, the settlement agreement is ambiguous[5] regarding any specific reason for the payment. Respondent relies on that ambiguity as showing that PACE had no specific intent when making the settlement payment. When a settlement agreement lacks express language stating the specific purpose of the settlement payment, the most important factor for courts to consider is the intent of the payor. See Kurowski v. Commissioner, 917 F.2d 1033, 1036 (7th Cir. 1990), affg. T.C. Memo. 1989-149. Accordingly, we must

---

[3]Petitioner acknowledges on brief that she bears the burden of going forward with evidence and the ultimate burden of proof. No question concerning the shifting of the burden under sec. 7491 was raised by either party.

[4]The requirement that to be excludable the compensation must be for "physical injuries or physical sickness" was added to sec. 104 by the Small Business Job Protection Act of 1996, Pub. L. 104-188, sec. 1605, 110 Stat. 1838.

[5]During trial respondent conceded that petitioner is in no way limited from showing the specific intent for the payment because of the ambiguity of the settlement agreement.

decide the reason or intent for the payment.  This is a purely factual inquiry.

There can be no doubt that petitioner's claim against PACE was based on tort or tort type rights.  The parties do not dwell on this requirement.  The focus of the parties' arguments is on the second requirement of the Schleier test, that the damages be received on account of physical injury or sickness.  It has been held that the second test "can only be satisfied if there is 'a direct causal link' between the damages and the personal injuries sustained."  Banaitis v. Commissioner, 340 F.3d 1074, 1080 (9th Cir. 2003) (quoting Fabry v. Commissioner, 223 F.3d 1261, 1270 (11th Cir. 2000), revg. 111 T.C. 305 (1998)), affg. in part and revg. in part T.C. Memo. 2002-5, revd. on other grounds sub nom. Commissioner v. Banks, supra.

When damages are paid in connection with a settlement agreement we first look to the underlying agreement to determine whether it expressly states that the damages compensate for "personal physical injuries or physical sickness" under sec. 104(a)(2).  See Pipitone v. United States, 180 F.3d 859, 863 (7th Cir. 1999).  If the agreement is ambiguous or lacks express language specifying the purpose of the compensation, courts then proceed to examine the intent of the payor.  Id. at 864; Kurowski v. Commissioner, supra at 1036; Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C.

Memo. 1964-33.  The payor's intent can be "based on all the facts and circumstances of the case, including the complaint that was filed and the details surrounding the litigation." See, e.g., Allum v. Commissioner, T.C. Memo. 2005-177, affd. 231 Fed. Appx. 550 (9th Cir. 2007).[6]

Petitioner's exposure to a hostile and stressful work environment exacerbated her MS symptoms to a point where she was unable to work.  This fact was confirmed by her doctor, who prescribed 2 weeks off.  Petitioner notified her employer of her condition and faxed to her employer her doctor's diagnosis together with his instructions that she take time off from work because of illness.  A short time later the executive director advised petitioner by telephone that her employment would be terminated effective March 15, 2009.

Petitioner obtained the services of an attorney and explained (in greater detail) the circumstances of her employment, illness, and termination from employment.  The attorney met with petitioner's employer's attorney and worked out a settlement of petitioner's claim against her employer. The agreement contained a blanket release from any and all

---

[6]Petitioner's failure to bring suit or make formal allegations against PACE "is not necessarily detrimental to * * * [her] efforts to establish the existence of an underlying tort-type cause of action."  Pipitone v. United States, 180 F.3d 859, 863 (7th Cir. 1999).

claims that petitioner might have had, but had no specific or express statement of the payor's intent.

An inference can be drawn, however, from the terms of the settlement agreement. The manner in which PACE agreed to pay out the settlement compensation reveals some recognition of petitioner's claim and condition. The $33,308 settlement was segregated into three separate and distinct payments. One amount ($8,187.50) was reflected as employee compensation due to petitioner which PACE agreed to pay directly to petitioner's attorney. Petitioner reported that $8,187.50 on her 2005 Federal income tax return as wage compensation. Another $8,187.50 was sent directly to petitioner's attorney, and no Form 1099-MISC or Form W-2 was issued to petitioner by PACE for that amount. The remaining $16,933 was paid by PACE to petitioner, and the payment was not reduced by withholding. PACE issued a Form 1099-MISC reflecting that the $16,933 was "Nonemployee compensation".

The differing tax and reporting treatments used for the three payments show that PACE was aware that at least part of petitioner's recovery may not have been subject to tax; i.e., was due to physical illness. Coupled with that inference is the fact that petitioner advised PACE of her illness before her employment was terminated and the likelihood that her attorney represented petitioner's circumstances to PACE in the course of the settlement negotiations. Petitioner made no other claim. We

find that PACE intended to compensate petitioner for her acute physical illness caused by her hostile and stressful work environment.

In summary, petitioner has shown that her work environment exacerbated her existing physical illness.[7]  Petitioner's condition and her MS flareup caused by her working conditions was intense and long lasting.  Petitioner was physically unable to work until sometime in 2006, more than 1 year following her termination.  She has shown that the only reason for the $16,933 payment was to compensate her for her physical injuries.

To reflect the foregoing and to account for concessions of the parties,

Decision will be entered

under Rule 155.

---

[7]It is of no consequence that petitioner had the MS condition before the flareup caused by her hostile work environment.